UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| J.P. CAREY LIMITED PARTNERS, L.P., | : | CASE NO. |
| PLAINTIFF, | : | |
| VS. | : | |
| POTNETWORK HOLDINGS, INC.; | : | |
| DEFENDANT. | : | MAY 24, 2018 |

# COMPLAINT

Plaintiff, J.P. Carey Limited Partners, L.P., by its undersigned attorneys, as and for its amended complaint against defendant PotNetwork Holdings, Inc., pleads as follows:

## I. The Parties

1. Plaintiff J.P. Carey Limited Partners, L.P. ("JP Carey" or "Plaintiff") is a limited partnership organized and existing under the laws of the state of Georgia; all of JP Carey's partners, including its general partner, have, at all relevant times, resided in, and currently reside in, the State of Georgia.

2. Defendant PotNetwork Holdings, Inc. is a Colorado corporation bearing Colorado Secretary of State ID number 20171182699 that, upon information and belief, maintains its principal office at 3278 Wilshire Boulevard, Suite 603, Los Angeles, California 90010.

## II. Jurisdiction and Venue

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) in that this action is between citizens of different states and the matter in controversy exceeds $75,000.00 exclusive of interest, costs and attorneys' fees.

4.  The Court has personal Jurisdiction over defendant PotNnetwork Holdings, Inc. pursuant to C.G.S. § 33-929(e), (f)(1), (f)(2) and(f)(4) and also pursuant to a contractual mandatory forum selection clause which is applicable to the dispute that is the subject of this action.

5.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) or (2), and pursuant to a contractual forum selection clause which is applicable to the dispute that is the subject of this action.

### III.  Facts Common to All Causes of Action

6.  Defendant PotNetwork Holdings, Inc. ("Defendant"), is a corporation that was originally organized on November 26, 2004 under the laws of the state of Wyoming.

7.  Defendant's common stock was, at all relevant times, quoted to trade over-the-counter in the United States and elsewhere under the symbol "POTN" and its primary trading venue is over the Link ATS operated by OTC Markets Group, Inc.

8.  Following its formation in 2004, Defendant filed papers with the Wyoming Secretary of State to amend its articles to change its name six times, as follows:

(a) on June 26, 2008, to change name to "United Treatment Centers, Inc."

(b) on February 4, 2013, to change name to "Element Trading Holding, Inc."

(c) on March 5, 2014, to change name to "United Treatment Centers, Inc."

(d) on July 21, 2015, to change name to "Potnetwork Holdings, Inc."

(e) on May 20, 2016, to change name to "SND Auto Group, Inc." and

(f) on March 1, 2017, to change name to "PotNetwork Holding Inc."

*The Convertible Promissory Note*

9.  On June 2, 2014, Sunrise Auto Mall Inc. ("SAMI"), at that time a wholly owned subsidiary of Defendant, as maker, entered into a Convertible Promissory Note ("Note 1") with David Grey ("Grey"), as holder, in the principal amount of One Million Eight Hundred and Fifty Thousand Dollars ($1,850,000.00) with a maturity date of June 2, 2015.

10. Pursuant to the terms of Note 1, the holder was granted the right to convert all or any part of the outstanding and unpaid principal amounts of Note 1 into fully paid and non-assessable shares of maker's common stock at a price determined in accordance with the conversion provisions set forth in the note; the maker's conversion right continued until the later of the maturity date of the Note 1 or the date of payment of the remaining outstanding principal balance amount plus any accrued and unpaid interest.

11. Pursuant to the terms of Note 1, maker was required to, at all times, reserve and keep available out of its authorized and unissued common stock, solely for issuance and delivery upon conversion of Note 1, a sufficient number of shares of common stock to cover conversion of Note 1.

12. Note 1 contained certain "anti-dilution" provisions which, *inter alia*, required, in case of any merger to which maker is a party and in which maker is not the surviving or continuing corporation, that, as a condition to such merger, provision shall be made so that, in the event of a conversion, the holder under Note 1 shall receive, in lieu of the securities and property receivable upon the conversion of the note prior to consummation of the transaction, the kind and amount of shares or other securities and property receivable upon such consolidation or merger by a holder of the number of shares of common stock into which Note 1 would have been converted immediately prior to such consolidation or merger had the conversion occurred, and

which provisions further require that the terms of Note 1 shall be applicable to the securities or property receivable upon the conversion of Note 1 after consummation of such merger.

13.     Note 1 also contained express provisions prohibiting maker from taking any action that would impair the rights and privileges of the holder or avoiding or seeking to avoid the observance or performance of any of the terms to be observed or performed by maker; and requiring maker at all times to act in good faith to assist in carrying out the provision of the note, including the conversion rights provided in the note, and further requiring maker to take all such action as may be necessary or appropriate in order to protect the conversion rights of the holder of the note.

14.     Note 1 also contained maker's express agreement that irreparable damage would occur in the event that nay of the provisions of the note were not performed in accordance with their specific terms or were otherwise breached, and that the holder of the note would be entitled to swift specific performance, injunctive relief or other equitable remedies to prevent or cure breaches of the note or to enforce specifically the terms and provisions thereof.

15.     As of July 1, 2015, the entire principal balance of Note 1, plus all accrued interest, remained unpaid and outstanding.

16.     On July 1, 2015, Grey, as seller, and Sign N Drive Auto Mall Inc. ("SND"), as buyer, together with SAMI, entered into a written Assignment of Note Agreement pursuant to which Grey agreed to sell, assign and transfer all of his right, title and interest in and to Note 1 to SND.

17.     Upon information and believe, Charles Vacarro ("Vacarro"), at all relevant times, was a control person with respect to both SND, SAMI and Defendant in that he possessed the power to direct the management and policies of all of those companies.

18.  On July 1, 2015, Grey, pursuant to the July 1, 2015 Assignment of Note Agreement, assigned and transferred all of his right, title and interest in and to the Note 1 to SND.

19.  SND paid sufficient consideration to Grey in exchange for Grey's assignment and transfer of his rights in and to the Note 1 to SND, including, but not limited to, SND's execution on July 1, 2015 of a promissory note payable to Grey in the amount of $250,000.

20.  By unanimous written consent of Defendant's Board of Directors (the "Board") dated July 1, 2015, the Board resolved to, *inter alia*, assume the obligations of SAMI under Note 1 and to exchange Note 1, for no additional consideration, for a convertible promissory note to be issued by Defendant to SND in the amount of One Million Eight Hundred and Fifty Thousand Dollars ($1,850,000.00) and containing the same terms as Note 1.

21.  In accordance with the Board's July 1, 2015 unanimous written consent, on July 1, 2015 Defendant, as maker entered into a Convertible Promissory Note ("Note 2") with SND, as holder, in the original principal amount of One Million Eight Hundred Fifty Thousand Dollars ($1,850,000.00); the date of Note 2 expressly tacked back to June 2, 2014. A true and accurate copy of Note 2 annexed hereto as Exhibit "A."

22.  Note 2 contained the same terms and conditions as Note 1, including, but not limited to, the anti-dilution provisions, the conversion share reservation provision, Defendant's express covenant to act in good faith, and Defendant's agreement that the holder would suffer irreparable injury and be entitled to specific performance; however, Note 2 granted the holder the right to convert outstanding principal and interest due under the note to common stock of the Defendant instead of SAMI.

*Sale of Portion of Note 2 to Southridge and Exercise of Conversion Rights*

23. As of July 18, 2016, the entire principal balance of Note 2, together with all accrued interest, remained unpaid and outstanding.

24. On July 18, 2016, SND, as seller, entered into a written Securities Transfer Agreement (the "STA") with Southridge Partners II, Limited Partnership ("Southridge"), as buyer, pursuant to which SND sold and delivered to Southridge, for sufficient consideration paid to SND by Southridge, $25,000.00 in principal plus all interest accrued on such principal, of the remaining and outstanding balance owed to SND under Note 2; included in the sale to Southridge were all of SND's conversion rights under Note 2 associated with the portion of the outstanding balance of Note 2 sold to Southridge. A true and accurate copy of the STA is annexed hereto as Exhibit "B."

25. Defendant was a signatory to the STA, and made express warranties and representations in the STA upon which Southridge relied and which were material to Southridge's agreement to enter into the STA, including, but not limited to, that:

    (a) Defendant would execute a replacement promissory note with Southridge named as holder;

    (b) Defendant would treat Southridge as a party to Note 2 with all the rights of, in place and stead of SND; and

    (c) Defendant had instructed its transfer agent to reserve at least 3,000,000 shares of Defendant's Common Stock for issuance to Southridge upon Southridge's exercise of its conversion rights;

(d) No payments had been made to SND on account of Note 2 and SND had not, directly or indirectly, waived or relinquished any of its rights under Note 2 and the provisions of Note 2 remain in full force and effect.

26. SND, as seller under the STA, also made express warranties in the STA including, but not limited to, the representation that SND was not, both as of the date of the STA and for a period of at least ninety days prior to the date of the STA, an "Affiliate" of Defendant as that term is defined in 17 C.F.R. § 230.144 ("Rule 144").

27. By its execution of the STA, Defendant confirmed that SND was not and had not been an Affiliate of Defendant for the purpose of Rule 144.

28. Southridge paid SND the consideration specified in the STA and fully complied with all its obligations arising under STA.

29. Notwithstanding the terms the STA, Defendant never issued a replacement note to Southridge to reflect the portion of Note 2 purchased by Southridge.

30. Upon information and belief, Defendant, by letter dated July 21, 2016, issued an irrevocable letter of instruction to Jersey Stock Transfer LLC ("JST"), the transfer agent for Defendant's common stock, whereby Defendant, in accordance with Section 2.4 of Note 2 instructed JST to reserve a sufficient number of shares of Defendant's common stock, initially 25,000,000 shares, for issuance to Southridge upon full conversion of Note 2.

31. Pursuant to a written Notice of Conversion issued by Southridge to Defendant dated July 25, 2016 (the "First Southridge Conversion Notice"), Southridge duly and properly exercised its conversion right under Note 2 and converted principal in the amount of $3,300.00 into 3,882,353 shares of common stock of the Defendant. A true an accurate copy of the First Conversion Notice is attached hereto as Exhibit "C."

32. Defendant complied with the First Southridge Conversion Notice and issued 3,882,353 shares of Defendant's Common Stock to Southridge.

33. Upon completion of the First Southridge Conversion Notice, the balance of Note 2 held by Southridge was $22,500.

34. Following a second round of conversion under Note 2 pursuant to a second written notice of conversion issued by Southridge on or about January 30, 2017, there remained a balance under Note 2 in the amount of $11,400.

35. Despite it having received Southridge's second conversion notice, and despite it having honored Southridge's first conversion notice, Defendant failed and refused to honor Southridge's second conversion notice.

36. Upon information and belief, on or about February 7, 2018, Defendant cancelled 4,500,000 shares of common stock originally issued specifically to enable Defendant to fulfill its debt conversion obligations, including any debt conversions under Note 2.

***J.P. Carey Acquires Interest in Conversion Shares***

37. Pursuant to the express terms of the STA, Southridge was permitted to sell and assign its rights under the STA to any person that purchases such rights in a private transaction or to any of its affiliates without SND's consent.

38. By written purchase agreement dated as of March 28, 2017 between Southridge and Alpha Capital Anstalt, LLC ("Alpha"), Alpha agreed to purchase the remaining principal balance of Note 2 then owned by Southridge, $11,400, including the conversion rights associated with that balance (said purchase agreement referred to hereinafter as the "Alpha PA"). A copy of the Alpha PA is annexed as Exhibit "D."

39. On March 28, 2017, in accordance with the terms of the Alpha PA, Southridge transferred its then remaining ownership interest in the principal balance of Note 2, $11,400, to Alpha.

40. On April 3, 2017, Alpha issued written Notice of Conversion (the "Conversion Notice") to Defendant pursuant to which Alpha duly and properly exercised its conversion right under Note 2 and converted principal plus accrued interest in the total amount of $13,988.58 into 1,434,726 shares of Defendant's common stock (the "Conversion Shares"). A true an accurate copy of the Conversion Notice is attached hereto as Exhibit "E."

41. Defendant ignored the Conversion Notice and failed and refused to issue any of the Conversion Shares to Alpha pursuant to the Conversion Notice.

42. As of January 8, 2018, Alpha still had not received any conversion shares from Defendant and Defendant's obligation to Alpha to honor the Conversion Notice remained due and owing.

43. Pursuant to a written Notice of Sale and Assignment of A Promissory Note and Outstanding Obligations, entered into effective January 8, 2018 by and between Alpha and Joseph C. Canouse ("Canouse"), Alpha agreed to sell, assign, transfer and convey to all of Alphas' rights and interests in Note 2, including Alpha's rights to the Conversion Shares, to Canouse. A copy of the purchase agreement between Alpha and Canouse is annexed hereto as Exhibit "F."

44. On or about March 1, 2018, Canouse assigned, transferred and conveyed all of his interests in and to Note 2, including his rights to receive the Conversion Shares, to Plaintiff, J.P. Carey Limited Partners, L.P.

*The Failed Merger Transaction*

45. On March 3, 2017, Defendant filed a Statement of Conversion with the Colorado Secretary of State, together with Articles of Incorporation, pursuant to which Defendant converted itself from a Wyoming corporation to a Colorado corporation.

46. On March 13, 2017, Defendant filed a Restated Constituent with the Colorado Secretary of State wherein Defendant disclosed its intention to reorganize in a manner functionally equivalent to reorganization pursuant to Section 251(g) of the General Corporation Law of Delaware.

47. On March 14, 2017, Defendant filed an Amended and Restated Articles of Incorporation with the Colorado Secretary of State pursuant to which, *inter alia*, it changed its name from "PotNetwork Holding Inc." to "PHI Transition Corporation."

48. On March 14, 2017, Defendant, as incorporator caused the filing of articles of incorporation with the Colorado Secretary of State to form a new subsidiary corporation, defendant PNH Holding Inc. ("New PHI"); at the time of its organization, New PHI was named "PotNetwork Holding Inc"; New PHI bears Colorado Secretary of State Id number 20171202909.

49. New PHI's authorized capital structure was identical to the capital structure the Defendant, to wit: 1,000,060,000 shares of stock, comprised of 1,000,000,000 shares of commons stock, 10,000 shares of undesignated preferred stock and 50,000 shares of Class A preferred shares.

50. On March 14, 2017, New PHI, as incorporator, caused the filing of articles of incorporation with the Colorado Secretary of State to form a new subsidiary corporation, defendant "SND Auto Group Inc." ("New SND"); New SND bears Colorado Secretary of State ID number 20171202933.

51. New SND's authorized capital structure was identical to the capital structures of New PHI and Defendant.

52. By a written merger agreement (the "Merger Agreement") dated effective March 17, 2017, Defendant and New SND agreed to a merger in accordance with Section 7-111-104 of the Colorado Business Corporation Act ("CBA"), pursuant to which New SND would be merged with and into Defendant, with New SND being the surviving corporation as a wholly owned subsidiary of New PHI.

53. New SND and New PHI, entered into a written Plan of Reorganization (the "Plan of Reorganization") back dated to be effective March 17, 2017, pursuant to which the two companies agreed on a holding structure in accordance with Section 7-111-104 of the CBA to effectuate the merger transaction contemplated in the Merger Agreement.

54. Pursuant to the terms of the Merger Agreement, upon the effective date of the merger - March 17, 2017 ("Merger Effective Date") - each share of Defendant was converted in the merger into the right to receive a duly issued, fully paid, and non-assessable share, or equal fraction of a share of New SND, having the same preferences, rights, and limitations as the share or fraction of a share of Defendant being converted in the merger.

55. Pursuant to the terms of the Merger Agreement, and in direct violation of the anti-dilution provision contained in Notes 1 and 2, unexercised conversion rights granted to Defendant's convertible debt holders, prior to the Effective Date would not be accorded a right to acquire shares of New SND and only Defendant's existing shareholders, as listed on Defendant's stock transfer ledger, would be converted in the merger into the right to acquire shares of New SND having the same preferences, rights, and limitations as the right to acquire shares of the Defendant being converted in the merger.

56. Pursuant to the Plan of Reorganization, New SND and New PHI agreed to a share exchange, pursuant to which all of New SND's issued and outstanding shares (as of the Effective Date) would be sold to New PHI in exchange for a specified number of shares of New PHI.

57. Pursuant to the Plan of Reorganization, existing shareholders of Defendant as of the date of the merger transaction would automatically receive, on a one for one basis, shares of New SND common stock in place of their shares of Defendant's common stock.

58. Upon information and belief, Defendant, New PHI and New SND consummated the merger transaction contemplated by the Merger Agreement and the Plan of Reorganization; New SND has merged into Defendant; Defendant's outstanding common stock was converted to shares of New SND and Defendant's common stock has been cancelled and retired; New SND continues as the corporation surviving the merger; and New SND has exchanged shares with New PHI as contemplated in the Plan of Reorganization.

59. Following completion of the merger transaction contemplated by the Merger Agreement and Plan of Reorganization (the "Merger Transaction"), Securities Counselors, Inc. ("SCI"), as counsel for New PHI and New SND, advised Southridge by letter dated April 27, 2017 that Note 2 was now a liability of New SND.

60. Upon information and belief, the merger transaction was developed and orchestrated by Vacarro and Randall Goulding for the purpose of avoiding Defendant's contractual obligations, including its debt conversion obligations under Note 2 and the STA, and the Merger Transaction served no legitimate purpose.

61. Following consummation of the merger, New SND and New PHI treated Southridge and Alpha as creditors that hold unexercised rights to convert its debt to stock of the privately held subsidiary (New SND) and not as a stockholder of New PHI.

*Defendant's Preferential Treatment of Debt Conversion Rights Held By Certain Parties*

62. At the same time that the Defendant and those that controlled Defendant sought, via the Merger Transaction, to subvert the contractual debt conversion rights of various parties, including Southridge and Alpha (and their respective successors and assigns), Vacarro and Blum, upon information and belief, used their control of Defendant, New SND and New PHI to provide preferential treatment to conversion claims held by certain other parties, including Vacarro; such preferential treatment included the following:

(a) On March 23, 2017, the very same day as the Merger Transaction, Defendant issued 39 million shares of Defendant's Common Stock upon the conversion of indebtedness owed to certain convertible note holders who's conversion rights were given preferential treatment over the debt conversion rights of others, including, but not limited to, Southridge and Alpha and their respective successors and assigns, including J.P. Carey;

(b) On July 1, 2017, subsequent to the Merger Transaction, Defendant issued an additional 42,000,000 shares of Defendant's Common Stock upon the conversion of indebtedness owed to certain convertible note holders who's conversion rights were given preferential treatment over the debt conversion rights of others, including, but not limited to, Southridge and Alpha and their respective successors and assigns, including J.P. Carey;

(c) On September 27, 2017, Defendant issued an additional 40,000 shares of Defendant's Common Stock upon the conversion of indebtedness owed to certain convertible note holders who's conversion rights were given preferential treatment over the debt conversion rights of others, including, but not limited to, Southridge

and Alpha and their respective successors and assigns, including J.P. Carey.

63.     Upon information and belief, New SND was created by Defendant to effectuate the Merger Transaction for the purpose of avoiding Defendant's contractual debt conversion obligations held by certain parties, including the conversion obligations provided under Note 2.

64.     Given Defendant's express obligations under Note 2 concerning the conversion rights therein, including the anti-dilution provisions contained therein, and Defendant's express covenant to act at all times in good faith to carry out the provisions of Note 2, including the conversion rights provided therein, and to take such action as necessary or appropriate to protect those conversion rights, Defendant's creation of New SND as an instrumentality to avoid those conversion rights was in violation of the terms of Note 2 and the STA.

*Defendants Unwind The Merger Transaction*

65.     On February 7, 2018, Randall Goulding caused Defendant to file a document with the Colorado Secretary of State titled "**Statement of Correction Revoking a Filed Document,**" (the "Corrective Statement"). Attached to the Corrective Statement, is a document titled **"Agreement to Unwind, Vitiate and Void Ab Initio, the Reorganization and Merger, in Order to Restore PotNetwork Holdings Inc. to its Status Prior to March 3, 2017, in Order to then Redomicile in Wyoming**" (hereinafter the "Unwinding Agreement").

66.     The parties to the Unwinding Agreement are New PHI, New SND, and Defendant, and the effect of the Unwinding Agreement is to unwind the Merger Transaction that had been effectuated by Defendant, New SND and New PHI in March 2017.

67.     On February 7, 2018, Randall Goulding caused New SND to file a copy of the Corrective Statement, along with the attached Unwinding Agreement with the Colorado Secretary of State.

68.   On February 13, 2018, Randall Goulding cause Defendant to file a document with the Colorado Secretary of State titled "Amended and Restated Articles of Incorporation" (the "Amended Articles").  Attached to the Amended Articles is a document titled "**Articles of Incorporation of PHI Transition Corporation, changing its name to 'POTNETWORK HOLDINGS INC.'**"   Pursuant to the Amended Articles, Defendant's name became, once again, "PotNetwork Holdings, Inc."

69.   Also on February 13, 2018, Randall Goulding caused New PHI to file with the Colorado Secretary of State a document titled "Amended and Restated Articles of Incorporation," executed by defendant Goulding on behalf of New PHI, pursuant to which New PHI's name was changed from "PotNetwork Holding Inc." to "PNH Holding Inc."

70.   On March 5, 2018, Randall Goulding caused Defendant to file a document with the Colorado Secretary of State titled "**Statement of Correction Correcting Information for Historical Purposes**" (the "March 5 Correction").  Attached to the March 5 Correction is a document titled "**Agreement to now Unwind and Reverse the Reorganization and Merger, in order to Restore PotNetwork Holdings Inc. akin to its Status Prior to March 17, but as a Colorado Corporation, Correcting the February 7, 2018 Filing to the Extent That It Suggests a Retroactive Effect**"  (the "Revised Unwinding Agreement").

71.   By the Revised Unwinding Agreement, Defendant sought to (1) remove the previous indication of an intent for Defendant to redomicile in Wyoming and (2) remove the stated intention in the Unwinding Agreement that the unwinding of the Merger Transaction was retroactive to the date of the Merger Transaction.

72. As a result of the unwinding of the merger transaction, Defendant was placed back in the same position as it was immediately prior to the Merger Transaction and it remains liable under Note 2 and obligated to honor the Conversion Notice.

73. JP Carey, as the assignee of Alpha, has the right to enforce Alpha's rights under the STA and under Note 2, including the right to enforce the Conversion Notice.

74. JP Carey has made written demand to Defendant to issue and tender the Conversion Shares.

75. Notwithstanding that the Merger Transaction has been unwound, Defendant has failed and refused to issue and tender the Conversion Shares to JP Carey.

## FIRST COUNT
### (Breach of Contract)

1 - 75. Paragraphs 1-75 above are hereby made Paragraphs 1-75 of the First Count.

76. Defendant breached the STA and Note 2 when it cancelled the common stock shares that had been reserved to honor conversions of Note 2 and when it failed and refused to issue common stock to Alpha pursuant to the Conversion Notice.

77. As a direct result of Defendant's breach of the both the STA and Note 2, Alpha sustained damages.

78. As the assignee of Alpha, Canouse acquired all the rights and interests previously held by Alpha in and to Note 2, including Alpha's rights with respect to the Conversion Shares.

79. As the assignee of Canouse, JP Carey acquired all the rights and interests previously held by Alpha in and to Note 2, including Alpha's rights with respect to the Conversion Shares.

80. JP Carey is entitled to recover damages from Defendant, on account of its breach of contract, in an amount to be determined at trial, but not less than $573,890.00.

## SECOND COUNT
### (Breach of Implied and Express Covenants of Good Faith and Fair Dealing)

1 - 80.   Paragraphs 1- 80 of the First Count are hereby made Paragraphs 1-80 of the Second Count.

81.   Defendant expressly agreed, in Note 2, that it would not take any action that would impair the rights and privileges of the holder of the note or seek to avoid the observance or performance of any of the terms to be observed or performed by Defendant, "but will at all times act in good faith to assist in carrying out the provisions of [Note 2], including the Conversion rights provided in paragraph 3 herein and will take all such action as may be necessary or appropriate in order to protect the conversion rights of the Holder of the Note."

82.   The conversion rights available to Alpha under the terms of Note 2 were a material benefit of Note 2 and the STA to Alpha, and Alpha reasonably expected that it would receive the Conversion Shares upon exercise of its conversion rights under Note 2.

83.   Defendant orchestrated the Merger Transaction as a mechanism to impede Alpha's conversion rights under Note 2.

84.   Defendant impeded Alpha's right to receive the Conversion Shares by cancelling the shares reserved for conversion under Note 2 and by refusing to honor the Conversion Notice.

85.   Defendant's cancellation of the conversion reserve shares and its failure to honor the Conversion Notice was not based on neglect or refusal prompted by any honest mistake as to Alpha's conversion rights.

86.   Defendant's cancellation of the conversion reserve shares and its refusal to honor the Conversion Notice was prompted by the Defendants' objective to deprive Alpha from owning stock interests in Defendant, in direct violation of Defendant's express covenant in Note 2 to act

in good faith with respect to the conversion rights provided therein.

87. Defendant, in cancelling the shares reserved for conversion and in refusing to honor the Conversion Notice as alleged above, acted with reckless indifference to the rights of Alpha to convert its debt under Note 2 into common stock of Defendant.

88. Defendant, in cancelling the shares reserved for conversion and in refusing to honor the Conversion Notice as alleged above, intentionally and wantonly violated Alpha's right to convert its debt under Note 2 into stock in a publicly traded company, Defendant or New PHI.

89. JP Carey, as the current owner and holder of Alpha's rights under the STA and in and to Note 2, including Alpha's rights under the Conversion Notice, is entitled to damages causes by Defendant's bad faith, in an amount to be determined at trial, but not less than $573,890.00.

## THIRD COUNT
### (Specific Performance)

1 - 89. Paragraphs 1-89 of this complaint are hereby made Paragraphs 1- 89 of the Third Count.

90. Southridge fulfilled all obligations imposed on it under the terms of Note 2 and the STA including payment of the full purchase price specified in the STA.

91. Neither Southridge, Alpha, Canouse nor JP Carey failed to fulfill any obligations imposed upon them under Note 2 or the STA.

92. Defendant wrongfully, without justification, and in breach of the terms of Note 2 and the STA, cancelled the common stock reserve required under Section 2.4 of Note 2.

93. Defendant wrongfully, without justification, and in breach of the terms of Note 2 and the STA, failed and refused to honor the Conversion Notice

94. In reasonable reliance on the STA and Note 2, Alpha changed its position such that injustice can be avoided only by specific enforcement of the STA and the conversion provisions set forth in Section 2 of Note 2.

95. Defendant and expressly agreed in Note 2 that irreparable damage would occur in the event any of the provisions of Note 2 were not performed in accordance with their specific terms or were otherwise breached.

96. Defendant further expressly agreed in Note 2 that, except with respect to payment of amounts due under the note, the holder of the note "shall be entitled to swift specific performance, injunctive relief or other equitable remedies to prevent or cure breaches of the provisions of this Note and to enforce specifically the terms and provisions hereof . . . "

97. Judgment compelling specific performance by Defendant of its obligation to honor the Conversion Notice is necessary to place JP Carey (as assignee of Canouse, as assignee of Alpha) in the position that it would have been in but for Defendant's, unexcused failure and refusal to honor the conversion provisions of Note 2.

98. JP Carey seeks a judgment of specific performance compelling Defendant to honor the Conversion Notice and issue common stock shares to JP Carey in an amount equivalent to 1,434,726 shares of Defendant's Common Stock issued on April 3, 2017.

**WHEREFORE**, the Plaintiff demands judgment on its amended Complaint as follows:

**AS TO THE FIRST COUNT:**
1. Damages;
2. Interest;
3. Reasonable attorney's fees;
3. Costs of this action; and
4. Such other and further relief as the Court deems appropriate.

**AS TO THE SECOND COUNT**:
1. Damages;
2. Punitive Damages;
3. Reasonable attorney's fees;
4. Interest;
5. Costs of this action; and
6. Such other and further relief as the Court deems appropriate.

**AS TO THE THIRD COUNT:**
1. A mandatory injunction ordering specific performance;
2. Reasonable attorneys' fees;
3. Costs of this action; and
4. Such other and further relief as the Court deems appropriate.

Dated: May 24, 2018

                                THE PLAINTIFF,
                                J.P. CAREY LIMITED PARTNERS, L.P.
                                By its attorneys
                                FLEISCHER LAW LLC

By:   /s/ Robert M. Fleischer
       Robert M. Fleischer
       12 Centennial Drive
       Milford, CT 06461
       Tel: (203) 283-3369
       Email: robf@ctnylaw.com